Telephone & Telegraph Co. v. Hartley.

CUMBERLAND TELEPHONE &. TELEGRAPH COMPANY *v.* J.
W. HARTLEY.

(*Nashville.*   December Term, 1912.)

1. **TELEPHONES AND TELEGRAPHS. In action for penalties the evidence is stated and held to be too conflicting to justify peremptory instructions.**

   In an action to recover penalties for the violation of the statute (Acts 1885, ch. 66, sec. 11, compiled in sec. 1842 of Shannon's Code) requiring telephone companies to supply all applicants for telephone connection and facilities without discrimination or partiality, provided such applicants comply or offer to comply with the reasonable rules of the company, the evidence is stated and reviewed, and *held* to be too conflicting to justify a peremptory instruction for the defendant. (*Post, pp.* 187-198.)

   Acts cited and construed:  Acts 1885, ch. 66, sec. 11 (compiled in sec. 1842 of Shannon's Code).

2. **SAME. In an action for penalties, the evidence is stated and held to be sufficient to support verdict for plaintiff.**

   In an action for penalties, as stated in the first headnote, the evidence is stated and reviewed, and *held* to be sufficient to support a verdict for the plaintiff. (*Post, pp.* 187-199.)

3. **SAME. Use of residence telephone as a business telephone means a regular use, as distinguished from an occasional use.**

   The use of a residence telephone as a business telephone, contrary to the rules of the company, means a regular, habitual, and substantial use, as distinguished from an occasional and incidental use. (*Post, pp.* 198, 199, 200.)

*On the question of the liability of a telephone company for failure to make connections for subscriber, see notes in 21 L. R. A. (N. S.), 115; 23 L. R. A. (N. S.), 554; and 39 L. R. A. (N. S.), 402.

Telephone & Telegraph Co. v. Hartley.

**4. SAME.   Classification of residence and business telephones, and higher rental for latter than for former; what is not a violation by renter of telephone.**

While a classification of telephones into residence telephones and business telephones may be properly made by the telephone company, and a larger rental may be demanded for the latter than for the former; yet an occasional and incidental use of the residence telephone for business purposes would not be a substantial breach of the classification, so as to entitle the company to the larger rental.   (*Post, pp.* 198, 199.)

**5. SAME.   Company refusing to put in a residence telephone upon its mere apprehension that it may be used as a business telephone is guilty of discrimination, when.**

Where the applicant demands a residence telephone and tenders the amount of the rental required under the rules of the company, it cannot lawfully refuse to put in the telephone upon the ground of its apprehension that the applicant may use the telephone as a business telephone, where there is no evidence that he proposed or intended to do so; and such refusal is a discrimination against the applicant, where it appears that there were thousands of other residence telephones in the city used by the lessees in the same manner as the applicant proposed to use his.   The time for the company to make its objection will be when the applicant uses his residence telephone as a business telephone.   (*Post, p.* 199.)

**6. CONSTITUTIONAL LAW.   Presumption and construction in favor of constitutionality of laws.**

A law is presumed to be constitutional, and a construction in harmony with the constitution must be given, if possible, although not the most obvious or natural one.   (*Post, p.* 200.)

Case cited and approved:   Manufacturing Co. v. Falls, 90 Tenn., 468, 469.

**7. TELEPHONES AND TELEGRAPHS.   Cumulative penalties are not recoverable for failure to furnish telephone upon demand; penalty for "each day" is only one penalty for each**

demand and suit; excessive fines or penalties violate the constitution.

Under a statute (Acts 1885, ch. 66, sec. 11, compiled in sec. 1842 of Shannon's Code), imposing a penalty for "each day" the telephone company refuses telephone connection and facilities without discrimination or partiality, after compliance or offer to comply with its reasonable regulations, only one day's penalty can be recovered in a suit for the company's such refusal to furnish telephone connection and facilities; because the expression "each day" means each day on which a demand is made, when that demand is refused after a reasonable time for compliance has elapsed; and the suit can be brought only for the one penalty incurred by the refusal of that particular demand; and to make the company liable for other penalties, other demands must be made, with a like wait of a reasonable time after each demand for a compliance with it, and for each refusal after each demand and like wait, a suit may be brought for the one penalty for each such refusal; for each penalty is a separate cause of action. The statute is remedial, and cumulative penalties are not recoverable under one demand; and a construction allowing such cumulative penalties would render the statute unconstitutional as creating excessive fines. (*Post, pp.* 200-204.)

Acts cited and construed: Acts 1885, ch. 66, sec. 11 (compiled in sec. 1842 of Shannon's Code).

Constitution cited and construed: Art. 1, sec. 16.

Cases cited and approved: Parks v. Railroad, 13 Lea, 1; Telephone Co. v. Telephone & Telegraph Co., 125 Tenn., 270, 281.

8. APPEALS. Case not remanded for new trial without giving plaintiff option to remit all above one penalty, when.

Where the only error in the trial court was in giving a judgment for more than one penalty, it was error in the court of civil appeals to remand the case for a new trial without offering the the plaintiff the option of remitting the excess above one penalty, with interest from the date of the judgment below. (*Post, p.* 204.)

9. **SAME. Costs upon affirmance after remittitur; and upon reversal and remandment for new trial where remittitur is refused.**

Where the plaintiff below (the defendant in error in the supreme court) accepted the option of remitting the excess above one penalty, the judgment will be affirmed for the one penalty, and for all costs; otherwise, the judgment will be reversed, and the cause remanded for a new trial, and the costs of the appeal will be taxed to defendant in error. (*Post, p.* 204.)

### FROM DAVIDSON.

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by writ of *certiorari* from the Court of Civil Appeals to the Supreme Court. —THOMAS E. MATTHEWS, Circuit Judge.

W. L. GRANBERY, CHARLES C. TRABUE, and AVERY HANDLY, for Telephone & Telegraph Co.

JAMES P. ATKINSON, for Hartley.

MR. JUSTICE NEIL delivered the opinion of the Court.

This action was brought to recover penalties under section 11, chapter 66, of the Acts of 1885. That section reads as follows:

"Every telephone company doing business within this State, and engaged in a general telephone business, shall supply all applicants for telephone connection and facilities without discrimination or partiality, provided such applicants comply or offer to comply with the

reasonable regulations of the company; and no such company shall impose any condition or restriction upon any such applicant that are not imposed impartially upon all persons or companies in like situations, nor shall such company discriminate against any individual or company engaged in lawful business by requiring, as condition for furnishing such facilities, that they shall not be used in the business of the applicant or otherwise, under penalty of one hundred dollars for each day such company continues such discrimination and refuses such facilities after compliance or offer to comply with the reasonable regulations, and time to furnish the same has elapsed, to be recovered by the applicant whose application is so neglected or refused."

The declaration alleges in its first count that defendant was engaged in the general telephone business, and refused to install a telephone in plaintiff's residence, No. 1720 Delta avenue, in the city of Nashville, on the 8th day of April, 1911, and subsequent thereto, although plaintiff demanded that such instrument be furnished and tendered the required charges therefor. The declaration continues: "And defendant still refuses to install or place said instrument or telephone in the said residence, although plaintiff has been ready and willing to pay the rental price for same. By reason of such refusal plaintiff has been greatly damaged, put to inconvenience, and is denied equal privileges with others similarly situated"—and that such conduct "is in contravention of the spirit and tenor of the law governing the defendant."

The second count of the declaration is in substance the same as the first, except that it distinctly refers to the statute above quoted and demands the penalties provided thereunder.

No special damages are proven or insisted upon, and the case must therefore be treated simply as a suit for the penalties under both counts.

In the trial court the plaintiff below recovered a judgment for $1,000. On appeal to the court of civil appeals by the telephone company, this was reduced to $100, the amount of one penalty. The case was then brought to this court by the writ of *certiorari,* applied for by both parties.

The errors assigned by the telephone company are, in substance, as follows:

That the court of civil appeals erred in not sustaining its motion for a peremptory instruction; secondly in not granting a new trial on the ground that there was no evidence to sustain the verdict; thirdly, in not granting a new trial for error of the trial court in submitting to the jury, as an issue in the case, the question as to whether or not the rule applied by the company was a reasonable rule; fourthly, in not granting a new trial for the error of the trial court in refusing to instruct the jury that the plaintiff could only recover for the first violation.

The only error assigned on the petition filed by Hartley is that the court of civil appeals erred in granting judgment for only one day's penalty.

We shall consider together the first and second assignments of error.

The facts as disclosed by Mr. Hartley are these: He is a real estate agent. Prior to January 1, 1911, he had a telephone in his home, and about that time went to the office of the telephone company to renew. On exhibiting his business card, the telephone agent saw his home telephone advertised on it. The card contained no business telephone, though there was a blank place left for it. In fact, he had no office telephone; had not had one for a year or a year and a half. The agent informed him, in substance, that he could not employ his telephone as a business telephone without paying business rates, and objected to his advertising his home telephone on his business card. Hartley then told the agent that, if he could not use his telephone the way he was using it, he did not want it, and ordered it taken out.

Subsequently, in April, he went to the office again and demanded that a telephone be put in, and the same matters were gone over as in the prior conversation, with the result that no telephone was put in. At the time this second demand was made, he offered to pay the rates for a home telephone for three months. After he left the office the telephone company sent two men to see him. His testimony on this subject is: "Two men came to my office, I think the next day, and wanted to make arrangements to put the telephone in for me; but they still wanted to limit the use of it, and I told them I wanted the telephone, but I didn't want it limited that way. I was willing to pay the price of a resi-

dence telephone. Q. You spoke of limiting the use. What did they state in reference to the limiting? Was it on account of the card, or what? A. Yes; it seemed to be on account of the card."

As to the use he had been making of his home telephone, his testimony is as follows:

"Q. Explain what they said. A. They said I must be particular how I used the telephone. They wouldn't let me use it, unless I used it in some particular way, and I didn't want to bind myself not to have the use of the telephone. . . . I am in the real estate business, and occasionaly I wanted to talk to customers over the telephone in the evenings or mornings, when I was at home, you know, and they wouldn't allow me that privilege. . . . Q. Did you use your home telephone especially for any business, or anything of that kind? A. No, sir; not especially; but I thought I had the right to use it mornings and evenings, when I was at home, if the occasion required. Q. Did you make any special point of using it at home nights and mornings? A. No, sir; only when it was convenient to call some one at night or mornings, and have them to call me. A great many times I wanted to talk to men that had residence telephones, and I couldn't get them at any other time, except in the mornings and evenings. Q. Why was it? A. Because they had business away from home, I suppose. That was the only way I could get them."

Again: "Now, in January, 1911, as I understand, the telephone people learned from your card when you went

down there that you were advertising it on your business card? A. Yes. Q. Advertising the residence telephone, and they then told you that you couldn't use the residence telephone as a business telephone unless you paid business rates; is that right? A. Yes; they told me that. Q. And you said, if you couldn't use it like you wanted to, they could take it out? A. Yes; I told them, if I couldn't have the use of the telephone, they could take it out. Q. And they did take it out? A. Yes, sir. Q. And that matter dropped for the time being, and a month or two afterwards, or three months elapsed, and you went back to them, and again asked them to put the telephone in? A. Yes. Q. Residence telephone; this same conversation in substance was repeated; is that so? And they told you that you couldn't use it? A. I must not use it in my real estate business, and they told me I must not advertise it in the paper. Q. Unless you paid business rates? A. If I had a piece of property for sale, and wanted to give the telephone number, they wouldn't allow me to do it. Q. And you declined to agree to that? A. I saw many others do that same thing over residence telephones."

Arthur Hartley, the son of the plaintiff below, testified that on the 8th of April he went to the telephone office with his father, and heard his father demand the telephone from the company. "Q. Now, will you tell the jury their reasons, if any, why they wouldn't put you in a telephone on that occasion? A. Because they said we wanted to use the telephone number on the business card. Q. Was your father prepared and ready to

pay the customary charges on that occasion? A. Yes, sir. Q. Did he so notify them? A. I think so. Q. Subsequent to that did you, in company with some one else, visit the defendant and demand the telephone? A. Yes, sir. Q. What date was that? A. April 12th. Q. What conversation took place? A. I couldn't say exactly what they said. Q. Give the substance. A. I asked them to put in a telephone, and they refused to do it. They said we were using the residence telephone as an office telephone, and they couldn't have anything like that done. . . . They said they wouldn't put it in because he was advertising it; was intending to use the telephone as a business telephone. . . . One of them said he had this office at his residence, and for that reason they couldn't put in a residence telephone at residence rates. I told them that he had an office in the city for the last four or five years, and still had one there; that he wasn't using his residence telephone as an office telephone in any way. . . . I offered them the money, and they wouldn't take it. Q. How much did you tender? A. Nine dollars. Q. Was that the amount that was required to pay for three months? A. That was what they said was the amount. Q. What was the expense of a business telephone? A. I suppose about $7 a month."

The witness K. B. Mann, who was with Arthur Hartley when the money was tendered testified to that fact, and that the only reason he heard given for the refusal to put in the telephone was that Hartley carried the number of his home telephone on his office card.

127 Tenn.—13

Mrs. Hartley testified that her husband transacted no part of his business at home, except in this way: "Just he would be home evenings, and if any one called him he would answer the telephone. Of course, he wouldn't make a business telephone out of the telephone at home. . . . If people would call, of course, he would answer in the evening, and Mr. Hartley in the evening sometimes would call some one. . . . Q. Your husband, you say, would use that telephone for business purposes when any one called him in the evening about business purposes? A. Yes, sir; if they called, he would make a date to meet them next day. . . . Q. You mean by that he scrupulously avoided transacting any business? A. No; he didn't do that. If there was anything he could transact over it in the evenings, he would do it. Q. Did he sometimes call people? A. Very seldom. Q. As a rule the use of the telephone was by people calling him. A. Persons knew he was in the office during the day, and would leave the office and get home about half past five or six in the evenings. Q. How would persons who wanted to speak to him by telephone manage to do that? A. Wait until he came home in the evening, I suppose. They would call me many a time during the day, and want to know where they could see Mr. Hartley, and I would tell them, 'at the office,' or they could wait until the evening, when he got home."

Mr. C. T. Hughes, witness for the telephone company, testified:

"Q. Did you ever meet the plaintiff here, Mr. Hartley? A. Yes, sir. Q. Do you recall having met him in the office in January, or about January, 1911? A

Yes. Q. State whether anything was said at that time about a business telephone, and in substance what occurred. A. He came down and inquired the rates of a business telephone. I quoted him the rates. A business telephone, direct line, is $7.50 gross a month, and the class of service he had in mind, a pay station, which is $4.50 guaranteed and fifty per cent excess refunded to the subscriber. The rates quoted him seemed to anger him to some extent, and he said he was very sorry we didn't have competition in town, and he said it wasn't absolutely essential that have a business telephone, and pulled his business card out, and showed me that he had a residence telephone, and that he was using it to take care of what he wanted a business telephone for. I told him that, if he was advertising his residence telephone for business purposes, he was putting it in line to be charged at business rates, if he was advertising it and using it for that purpose. He, being mad at the time, got still madder, and said, 'Just take it out then;' he wouldn't use it any at all. We then started to explain to him what we meant by a business telephone, and he wouldn't listen to it at all. Q. Did the fact that his residence number was on his business card that he showed you have anything to do with your taking that telephone out? A. It had this much to do with it: That when he showed it to me, and said that he didn't absolutely have to have a business telephone, because he had one that answered the purpose, then I told him he was laying himself liable to have a business rate apply to his residence telephone, and then he ordered it out. It

had that much, and no more. Q. Then you don't object to a business card having a residence telephone on it, if the party has an office and transacts business in town? A. Provided he doesn't use his residence for business. Q. At what time? A. Any time. Q. Can you designate any time when you require patrons to do this? A. We don't designate any time. Q. Did you tell him any specific time? A. Did not. Q. Have you that language in the contracts? A. We do not. Q. Do you inform patrons of that when they take telephones? A. At certain times, yes. Q. That they can't use it in business at all? A. Yes; that is understood. Q. By whom? A. By the subscribers and telephone company." Then follows an examination, the purport of which is that the witness did not have a contract with him, and did not remember the terms of the contract. "Q. Now Mr. Hughes, when Mr. Hartley came down there to have a telephone placed in his residence in April, also his son, and tendered the money, what was your reason then for not putting in a telephone? A. Because he said he wanted it to use just as he had used the other one; he wanted to list it on his business card, and use it just as he had used the other. Q. He was specific in telling you that, was he? A. He was, or whoever it was; I don't know whether it was Mr. Hartley or his son. He said he wanted to use it just as he had the other. Q. Did he tell you how he had used the other one? A. No. Q. He didn't know and you didn't know? A. I know what he said, yes, in the former conversation."

Mr. Hartley was introduced in rebuttal, and he denied the statement made by Mr. Hughes, to the effect that he didn't need the business telephone anyhow, and that he used the home telephone in his business. He denied that he said this or anything of the kind. On cross-examination he was asked and answered: "Q. How did you happen to produce that card on that occasion? A. I can't explain that. I wasn't covering up anything, but somehow I showed him that card. I don't know why I did, but when he saw the telephone number on the card he says: 'That number will have to come off of that.' I was surprised at that. I says, 'Why, what do you mean?' He says, 'That is against the rules of the company to use your residence number on your business card without I had an office telephone, too.' Well, I didn't have an office telephone. I says, 'I didn't know that was against the rules of the company; I didn't know anything about it; I didn't know I was doing anything wrong;' and he said it would have to come off, and I talked to him awhile. As to getting mad, I don't know about that; but anyway I told him, I says, instead of ordering it out—I didn't order it out. I told him I says, 'If I can't have the use of that telephone, you can take it out.' That is the words I used: 'If I can't have the use of the telephone, I don't want it.' Q. Did you mean, by that, if you couldn't have the use of it as you had been? A. If I couldn't have the use of it as I needed it, if I couldn't have the use of it as other people did, I didn't want it. Q. Did you mean, by that, if you couldn't have the use of it, advertising it on your

card, for instance, that you didn't want it? A. Now, if I wanted to answer or call in the evening on real estate business, or any other business, if I wasn't allowed to use that telephone to answer, I didn't want it. I told him, if I couldn't have the use of it, he could take it right out. Q. What was the thing that he objected to your doing? A. Why, he objected to my having the number on that card. Q. That is all he objected to? A. Well, he said that was too much like an office telephone. Q. And it was then, as you have stated, you said that, if you couldn't have the use of it, take it out.' A. I didn't order it out, as he says. I told him, if I couldn't have the use of it, they could take it out; and so they decided I couldn't have the use of it, I suppose."

From the foregoing pretty full statement of the evidence, it is seen that there is too much conflict to justify the court in taking the case from the jury; therefore the first assignment must be overruled.

The second assignment raises the question whether there is any evidence to support the verdict. We think this must be answered in the affirmative. There is evidence to the effect that Hartley intended to use the new telephone just as he had the old one; that his business use of the old one, or former telephone, was not a regular business use, but simply occasional and incidental, while he was at home in the evenings, or at night and in the morning before going to his office. While we are of the opinion that a classification of telephones into residence telephones and business telephones is correct and proper, and that a larger rental may be demanded

for the latter than for the former, we do not think an occasional use of the residence telephone in the manner just described would be a substantial breach of the classification, and justify the charging of the higher rate.

There is also evidence to the effect that Hartley was using his residence telephone just as other telephone subscribers were using theirs. It follows, under this evidence, there were two grounds on which the tele-phone company rendered itself liable, as violating the rule of equality in treatment. In the first place, as stated, other persons were permitted to use the tele-phone in the same manner that Hartley was using his, and proposed to use his, and to deny him the right under such circumstances was a discrimination against him. In the second place, he demanded a telephone and ten-dered the amount of rental required under the rules of the company for a residence telephone. The refusal to put in for him a residence telephone, when, as appears from the testimony, there were thousands of other telephones in the city, was a discrimination against him. It was the duty of the telephone company to put in the telephone on demand and tender of the rental as a pri-vate telephone, and, if Hartley subsequently used it as a business telephone, then was the time for the company to make its objection. The evidence does not show he had been using his former telephone improperly, or that he proposed to make an improper use of the one he requested to be put in. The second assignment must therefore be overruled.

The third assignment is based on the following contained in the judge's charge.

Plaintiff in error's eighth request for additional instructions was as follows:

"The defendant's contention is that plaintiff, who was engaged in the business of a real estate agent, and who maintained an office as such, did not have an office telephone, but advertised his residence telephone on his business card, and used his residence telephone as a business telephone; and if you should find from the preponderance of the evidence that this is true, then your verdict should be for the defendant."

Given with this explanation, to wit: "You must understand the words 'use his residence telephone as a business telephone' to mean use it regularly, habitually, and substantially, as distinguished from only occasionally and incidentally."

The objection urged is based on this explanation added by the trial judge. We think there was no error in this.

The fourth assignment of the plaintiff in error will be disposed of in connection with the assignment which the defendant in error has made, to the effect that the court of civil appeals erred in holding that there could be a recovery of only one penalty.

The sanction of the law is a "penalty of one hundred dollars for each day such company continues such discrimination and refuses such facilities, after compliance, or offer to comply, with the reasonable regulations, and time to furnish the same has elapsed, to be

recovered by the applicant whose application is so re-fused."

It must be presumed that the legislature, in enacting a law, does not intend to violate any provision of the constitution, and a construction in harmony with that instrument must always be given by the court, if possible, although not the most obvious or natural one. *Cole Mfg. Co. v. Falls,* 90 Tenn., 468, 469, 16 S. W., 1045. There is evidence in this record that a contract for a year may be made, with three months payment in advance, at a given rate per month. Under the construction insisted on by defendant in error, the demand for such a contract, with the requisite tender of the advance payment, and a refusal on the part of the company, would at the end of the year fasten upon the company a liability of $36,500, which would be nothing less than an excessive fine, and in violation of article 1, sec. 16, of our constitution of 1870. *Telephone Co. v. Telephone & Telegraph Co.,* 125 Tenn., 270, 281, 141 S. W., 845. The illustration is an extreme one, but the case might easily occur under the act, if the construction suggested be sound. The result would be the same for any accumulation of penalties, which would permit the act to be used for speculative purposes. It is suggested in argument that the company might halt such accumulation by complying with the demand on any day subsequent thereto. True; so may any one avoid an excessive penalty by abstaining from doing those things denounced by the statute imposing the pen-

alty; but that does not meet the constitutional inhibition against passing laws imposing such penalties.

The act contemplates a demand united with an offer to comply with the company's regulations, a delay sufficient to enable compliance, a failure to comply, and suit based on such demand and refusal, claiming the penalty incurred. Nothing is said concerning the length of time the company may have for compliance. It is obvious this must depend upon circumstances varying at different times. For example, there might be so many demands made on the same day that the company would be unable to comply with one or more until several days had elapsed; or there might be a strike, or an epidemic; or there might occur, without negligence, a temporary inability to secure materials for the work, owing to any one of the causes which disturb the market, or derange the orderly operations of industry. These and other defenses might be shown by the defendant in such a suit, on whom the burden of exoneration would lie. As stated, the statute contemplates a demand, a wait, a failure to comply, a suit; the first three constituting the basis of the fourth. It is manifest that the day or days necessary for the reasonable wait, or grace, would carry no penalty; nor would the days elapsing after the expiration of such reasonable time—that is, it was not contemplated that an applicant for the purpose of accumulating penalties with a view to speculation thereon should lie by and fail to bring suit any longer than the expiration of a reasonable time given the company to comply. The

purpose of the act was remedial, to compel compliance in the case of each several demand. It is clear, therefore, that the expression "each day" does not mean each day following the making of a demand, but each day on which a demand is made, when that demand is refused after reasonable time for compliance has elapsed; the suit being brought for the penalty of $100 incurred by the refusal of that particular demand. It was contemplated that from time to time other demands might be made, and other refusals supervene, and other penalties be incurred, for which other suits might be brought. Each penalty is a separate cause of action. Justice and mercy are joined. The thunders of the law are heard, but its lightnings do not utterly destroy. The culprit is given warning, and a place for repentance. Stroke after stroke, suit after suit, may be inflicted, until duty is performed.

What is here said is in accord with *Parks* v. *Railroad*, 13 Lea, 1, 49 Am. Rep., 655, and *Telephone Co.* v. *Telegraph & Telephone Co.*, supra, as to the duty of a complaining party to bring suit for the first violation; but the terms of the present statute admit of subsequent suits, being in that respect different from that considered in *Parks* v. *Railroad*. The facts presented in *Telephone Co.* v. *Telegraph & Telephone Co.*, supra, did not require an expression of opinion or construction of the statute on this last point; the court holding in that case that all of the refusals were justified. 125 Tenn., 287, 141 S. W., 845 (loc. cit.).

From what has been said, it is apparent that plaintiff in error's fourth assignment of error must be overruled; also defendant in error's only assignment.

We are therefore of the opinion that the court of civil appeals reached the correct conclusion in holding that suit could be brought for only one penalty at a time. We are of the opinion, however, that that court erred in remanding the case for a new trial, without offering defendant in error the option of remitting all in excess of $100, with interest from the date of the judgment below. Upon accepting this option, defendant in error will be entitled to an affirmance of the judgment here for the sum last mentioned, and for all of the costs; otherwise, the judgment will be reversed, and the cause remanded for a new trial, and the costs of the appeal taxed to defendant in error.